1  PAUL T. TRIMMER
   Nevada Bar No. 9291
2  **JACKSON LEWIS P.C.**
   300 S. Fourth Street, Ste. 900
3  Las Vegas, Nevada 89101
   Telephone: (702) 921-2460
4  Facsimile: (702) 921-2461
   Email: paul.trimmer@jacksonlewis.com
5
6  John M. Nolan III (pro hac vice in progress)
   Three Parkway
7  1601 Cherry Street, Suite 1350
   Philadelphia, PA  19102
8  T: (267) 319-7802
   F: (215) 399-2249
9  J.Michael.Nolan@jacksonlewis.com
10
11 *Attorneys for Plaintiff*
   *Marina District Development*
12 *Company, LLC d/b/a Borgata Hotel Casino & Spa*
13                **UNITED STATES DISTRICT COURT**
14                       **DISTRICT OF NEVADA**
15
16
17 **MARINA DISTRICT DEVELOPMENT
   COMPANY, LLC d/b/a BORGATA
18 HOTEL CASINO & SPA**,
19 1 Borgata Way, Atlantic City, NJ 08401            **CIVIL ACTION NO.: 2:20-cv-01592**
20                  **Plaintiff,**
   v.
21                                                  **MOTION AND MEMORANDUM OF
                                                    LAW IN SUPPORT OF PLAINTIFF'S**
22 **AC OCEAN WALK, LLC d/b/a OCEAN               **MOTION FOR A TEMPORARY
   CASINO RESORT**,                                RESTRAINING ORDER AND
23 500 Boardwalk, Atlantic City, NJ, 08401        PRELIMINARY INJUNCTION**
24 **WILLIAM CALLAHAN**,
   5554 West Ave, Ocean City, NJ, 08226
25
26 **KELLY ASHMAN BURKE**,
27                  **Defendants.**
28

JACKSON LEWIS P.C.
   LAS VEGAS

## MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff Marina District Development Company, LLC d/b/a Borgata Hotel, Casino & Spa requests that the Court enter a Temporary Restraining Order, attached hereto as <u>Exhibit H</u>, enjoining Defendants AC Ocean Walk, LLC d/b/a Ocean Casino Resort ("Ocean"), William Callahan ("Callahan"), and Kelly Ashman Burke ("Burke") (collectively, "Defendants") from continuing to violate the Defend Trade Secrets Act and other contractual and statutory obligations.  This Motion is based on Borgata's Verified Complaint, the following Memorandum of Points and Authorities, the attached exhibits all pleadings and documents on file with the Court, and any oral argument the Court deems proper.

## I.   INTRODUCTION

The Defendants AC Ocean Walk, LLC d/b/a Ocean Casino Resort ("Ocean"), William Callahan ("Callahan"), and Kelly Ashman Burke ("Burke") (collectively, "Defendants") have commenced an unlawful scheme to permanently disrupt and irreparably harm Borgata's casino operations.

- In June 2020, unbeknownst to Borgata, Ocean targeted and solicited Callahan and Burke – Borgata's Vice President and Executive Director of Casino Marketing, respectively – because of their access to and ability to misappropriate Borgata's trade secrets, including client relationships with the high-level casino customers who are responsible for more than $25 million dollars in revenue every year.

- Ocean successfully enticed both Callahan and Burke to accept new positions at Ocean on or about July 22, 2020 – indeed, Callahan left Borgata only one year into a three-year contract that paid him approximately $370,000.00 annually, plus bonus – in violation of employment agreements which prohibited them from competing against the Borgata for a period of one year after their employment.

- Ocean announced Callahan and Burke's hiring in an August 13, 2020 press release, and within weeks had hired four additional Borgata casino and hospitality executives, essentially recreating the team of executives that Callahan had supervised at Borgata to service Borgata's most important clientele.

None of the foregoing facts are in dispute. For that reason, and as set forth in more detail below, Borgata contacted Ocean on August 20, 2020, demanding that Ocean: 1) cease employing Callahan and Burke in violation of their agreements with Borgata, (2) cease using Callahan,

Burke to solicit Borgata employees, (3) cease and desist misappropriating Borgata's trade secrets and other confidential and proprietary information, (4) cease and desist contacting Borgata's customers, (5) cease and desist its coordinated conspiracy to tortiously interfere with Borgata's contractual and other business relationships, and (6) provide immediate assurances that its efforts to discontinue such acts was genuine and verifiable.

The risk of misappropriation is real and concrete. Callahan and Burke, as well as the other Borgata executives they solicited on Ocean's behalf, have intrinsic knowledge of Borgata's marketing strategies, customer loyalty databases, and the Company's most important customers' preferences and needs. Callahan in particular has unique and confidential knowledge of the things that matter most: the terms of credit that Borgata has been able to offer, the discounts on losses that Borgata has offered, the game rules that Borgata has and has not been willing to change in order to entice high-limit gamblers to play at the Borgata, and the historical knowledge of these players hotel, amenity and food and beverage preferences that induced them to return to Borgata time after time. Burke's understanding and knowledge of Borgata's customer databases, the way that data can be used to drive business, and other strategic initiatives is equally confidential and proprietary. Put another way, Callahan and Burke know exactly which trade secrets have importance and can be exploited in order to give Ocean a competitive advantage when soliciting casino customers to leave Borgata and patronize Ocean.

Of equal importance to this application for injunctive relief is Callahan's continued misappropriation of his Borgata-issued smartphone. The phone was Callahan's lifeline to customers when he worked at Borgata. It has lists of players and text message conversations containing specific knowledge about each player and his or her preferences. Borgata demanded that the phone be returned, including specific requests on August 24 and 25, 2020. Callahan has refused, and while he has now provided it to his counsel at Blank Rome, Callahan continues to refuse to return the phone despite Borgata's offer to allow the phone to be delivered directly to the well-respected forensic experts at HOLO Discovery to allow for an immediate forensic copy and to make the information available to Ocean via discovery requests. Borgata has also offered to direct HOLO to screen out any privileged communications. Ocean's apparent insistence that it be

allowed to make a forensic image of a phone filled with trade secrets, a phone which has been misappropriated in the first place, is less than meritless.  It is a declaration of intent to commit a violation of the Defend Trade Secrets Act and applicable trade secrets laws.  On its own, Ocean's refusal to return the phone warrants immediate injunctive relief.

Borgata has attempted to resolve this dispute informally.  As noted above, it sent a cease and desist letter on August 20, 2020, and its counsel has been in constant contact with Ocean's counsel since August 24, 2020.  Ocean has refused to provide assurances that it will discontinue employing individuals in violation of their noncompetition agreements and has refused to provide assurances that it is not misappropriating trade secrets.  Indeed, it has offered no real defense or justification for its conduct.  It has not contended that the customer knowledge Callahan and Burke have misappropriated does not constitute a trade secret.  It has offered no explanation for Burke's obvious violation of her non-competition agreement nor has it defended its decision to continue to employ her in a position virtually identical to the position she had at Borgata.  It has not thus far defended Borgata's allegation that Burke has solicited other Borgata employees.

Ocean's only explanation for Callahan's conduct – that he is employed as a hotel executive and not as a casino marketing executive and he therefore is not violating his non-competition covenant – is a disingenuous, transparent coverup.  Callahan began planning his departure in June 2020 when he received correspondence from Ocean's primary investor, Michael Conboy at Luxor Capital.  The timing of Callahan's resignation from Borgata and hiring by Ocean coincided with the departure of Ocean's prior Vice President of Relationship Marketing on July 22, 2020.  The press release that Ocean issued on August 13, 2020, announcing Callahan's retention focused on Callahan's efforts to enhance guest experiences, not his operational acuity.  And, finally, Callahan did not supervise hotel operations in any way for the 18 years he worked at Borgata.  He has not supervised housekeeping.  He has not supervised front services.  He has not supervised a bell and valet department.  He has not supervised the environmental services employees who provide janitorial services throughout the hotel's public areas.  In short, while Callahan is an experienced and desirable casino marketing executive, there is no serious, experience-based justification for Ocean's decision to hire him as a Senior Vice President to run a

1,400 room hotel operation in the middle of a pandemic that creates a host of unprecedented sanitation challenges for hotel operations.  The simple and obvious explanation is that Callahan has been given a misleading job title to avoid the restrictions of his non-compete agreement.

Borgata has done everything possible to resolve this matter without court intervention.  But Oceans' refusal to voluntarily do whatever is necessary to end and prevent further misappropriation of Borgata trade secrets, including return of Callahan's mobile phone, makes this application for injunctive relief necessary.  Ocean will not cease employing Callahan and Burke in violation of their non-competition agreements.  It will not provide assurances that it will cease misappropriation of trade secrets.  It will not return Callahan's misappropriated phone, a per se violation of the Defend Trade Secrets Act.  A temporary restraining order that stops Ocean's misconduct and which protects Borgata's trade secrets from further abuse is required.  Improper use of trade secrets constitutes irreparable harm. *ADP, LLC v. Trueira*, No. 18-3666 (KM) (CLW), 2019 U.S. Dist. LEXIS 181537, at *62 (D.N.J. Oct. 18, 2019) (*citing U.S. Food Serv., Inc. v. Raad*, 2006 WL 1029653, at *6 (A.J. Super. Ch. Div. Apr. 12, 2006) at *7 ("Damages will not be an adequate remedy when the competitor has obtained the secrets. The cat is out of the bag and there is no way of knowing to what extent their use has caused damage or loss.")).

## II.      FACTUAL BACKGROUND

Borgata incorporates herein by reference the facts and allegations set forth more completely in its Verified Complaint and Request for Injunctive Relief. *See* Dkt. No. 1.

### A. Ocean Has Hired William Callahan In Violation Of His Employment Agreement With Borgata, And Through Callahan Is Misappropriating Borgata's Trade Secrets And Other Confidential And Proprietary Information And Soliciting Borgata Employees In Violation Of Callahan's Non-Solicitation Agreement.

Borgata is hotel, casino, and spa located in Atlantic City, New Jersey.  Defendant Callahan worked for Borgata in its casino marketing department for approximately eighteen years. Compl. ¶¶ 13-33.  Using Borgata's resources and backing, Callahan established and grew relationships with the Company's most important casino clients, including MLife "Noir" guests who, taken together, generate over $25 million in revenue for Borgata each year.  *Id.*  Callahan's final position was Vice President of Relationship Marketing.  In that position, he reported directly

to Borgata's president, Melonie Johnson. *Id.*  He earned several hundreds of thousands of dollars plus bonus each year.[1]  At the time of his resignation on July 11, 2020, Callahan's employment with Borgata was contractual, with the "Specified Term" of employment from March 20, 2019 through March 19, 2022. *See* Callahan Employment Agreement attached hereto as <u>Exhibit "A"</u>.

Callahan's job duties included developing relationships with Borgata's potential and existing clients, securing relationships with existing clients, and acting as a high-level liaison for Borgata's high level casino clientele and large corporate patrons.  *Id.* Callahan has detailed personal and professional knowledge of Borgata's high level and corporate clientele as a result of his job duties for Borgata.  He was responsible for the overall guest experience, and most significantly, Callahan was aware of and the relationship manager for the most important decisions that Borgata made regarding these customers. *Id.*  He did not direct credit decisions, but was aware of the players' credit limits, and the decisions that Borgata made in that regard.  If players were unhappy with credit decisions, they would appeal to him. *Id.*

Callahan was involved in discussions regarding top players' other principal requests: game changes.  In some situations, high value customers will request game modifications that could affect game play and an individual player's odds of success.  Borgata would negotiate those rule changes with players, and Callahan was aware of and involved in that process.  By virtue of his involvement, he was aware of that changes that players desired and the changes that, if refused, might lead players to take their business elsewhere.  *Id.*

Callahan communicated with these customers with a smartphone provided by Borgata for work purposes.  *Id.* This phone contains the personal cell phone numbers and other contact information for these players and patrons. Anyone in possession of this smartphone is in actual possession of Borgata's highest-tier player and patron list and the means to communicate with them directly. This type of information is highly sensitive information in the gaming industry and is the exact type of information that could be used by Borgata's competitors to sway high level

---

[1] To protect the secrecy of this amount, Plaintiff has redacted Callahan and Burke's Employment Agreements.  The specific amounts and unredacted versions will be made available to the Court for review.

and corporate clientele to patronize their hotels and casinos, instead of Borgata. The contents of Borgata's smartphone, assigned to and provided to Callahan and still in his possession, constitute highly sensitive Borgata trade secrets. *Id.*

Callahan's possession and use of the phone and the Company's e-mail and other systems was subject to four different policies: 1) the Computer Use Policy, 2) the Mobile/Cellular Device Policy; 3) the Computer/Acceptable Use Policy; and 4) the Code of Conduct. <u>Exhibit B</u>. Collectively, those policies forbid Callahan from misusing or misappropriating data from the phone, apprized him that his use of the phone was subject to monitoring, that he had no expectation of privacy, and that he was obligated to protect the information on the phone from disclosure to others.

Upon his resignation, Callahan did not return the smartphone.  In fact, Callahan's former executive assistant, Colleen Hermann, contacted Callahan on Friday, July 17, 2020 to insist that Callahan return the phone. *See* Johnson Decl., attached as <u>Exhibit C</u> and Hermann Decl., attached as <u>Exhibit D</u>. Callahan informed Hermann that he would bring the phone on Monday, July 20, 2020.  *Id.*  He did not do so, however, and he (through his counsel) is still in possession of the smartphone and all of the communications and player and patron phone numbers inside it, and all of the players' and patrons' particular needs and requests overseen and handled by Callahan.

Even without the smartphone itself, Callahan has personal and intrinsic knowledge of the particular wants and needs, permissions sought, accommodation preferences, schedules, gaming habits, credit requirements, comp requirements, and staffing preferences for Borgata's highest level players and top patrons.  *Id.* Due to Callahan's high-level position with Borgata and inevitable obtainment and development of detailed personal and professional knowledge of Borgata's most valuable clientele, his Employment Agreement contained restrictive covenants, including non-solicitation, confidentiality, and non-competition provisions. In the Employment Agreement, Callahan specifically acknowledges that he would obtain sensitive information rising to the level of "Confidential Information" in the performance of his job functions:

> Employee acknowledges that, in the course of performing Employee's responsibilities under this Agreement, Employee will form relationships and become acquainted with "Confidential Information" (defined below in Section 22). Employee further acknowledges that such relationships and the Confidential Information are valuable to Employer and the Company, and the restrictions on Employee's future employment contained in this Agreement, if any, are reasonably necessary in order for Employer to remain competitive in Employer's various businesses and to prevent Employee from engaging in unfair competition against Employer after termination of Employee's employment with Employer for any reason.

*See* Exhibit "A", ¶ 8.

Callahan's Employment Agreement also contains a non-competition provision:

> Competition. Except as otherwise explicitly provided in Paragraph 10 of this Agreement, during the entire Specified Term and thereafter for the "Restrictive Period" (defined below in Section 22) Employee shall not directly or indirectly be employed by, provide consultation or other services to, engage in, participate in or otherwise be connected in any way with any "Competitor" (defined below in Section 22) in any capacity that is or directs the same, substantially the same or similar to the position or capacity (irrespective of title or department) as that held at any time during Employee's employment with Employer; provided, however, that if Employee remains employed at-will by Employer after expiration of the Specified Term Employee shall not be subject to this Section 8.1 unless (i) Employee is terminated for Employer's Good Cause as determined by Employer  or (ii) Employee resigns his or her position, in which case Employee will remain subject to this Section 8.1 for the remainder of the Restrictive Period.

*See* Exhibit "A", ¶ 8.1.

The Employment Agreement defines the Restrictive Period as "the twelve (12) month period immediately following any separation of employee from active employment for any reason occurring during the Specified Term or the twelve (12) month period immediately following the expiration of the Specific Term." *See* Exhibit "A", p. 16. Callahan specifically agreed not to work for Borgata's competitors as follows (in relevant part):

> (1)  Any person, corporation, partnership, limited liability company or other entity or any kind, no matter how defined or identified, that is either directly, indirectly or through an affiliated entity, engaged in or proposes to engage in the ownership, operation or management of a gaming establishment that (i) is located anywhere worldwide and will regularly or on occasion accept single hand Baccarat wagers equal to or greater than $25,000 USD or (ii) is located in Macau, Hong Kong, Singapore, Taiwan, Japan, South Korea or within the city limits of Atlantic City, Philadelphia, Boston or Baltimore or within Prince Georges County, Maryland; or

See Exhibit "A", p. 14.

On or about July 21, 2020, Callahan became an employee of Ocean.  Compl. ¶¶ 39-53. Ocean is indisputably a direct competitor to Borgata in the casino, gaming, hotel, and spa industry. Despite having a different job title, Borgata is informed and believes that Callahan performs some, if not all of the same job functions for Ocean that he performed as Vice President of Relationship Marketing for Borgata, including collaborating with Burke, O'Connor, Burch, and Herschel and others to provide services to top level casino customers.  Similarly, Borgata believes that Callahan is also involved in the "direct[ion]" of those same activities.  *Id.*   Other evidence also supports this belief.  Callahan began negotiating with Ocean in at least June 2020, and at those negotiations appeared to include discussions about structuring his job title to create the impression that his job did not violate the employment agreement.  Moreover, Ocean's Vice President of Relationship Marketing left Ocean almost simultaneously with Callahan's hiring. Although Callahan's title at Ocean is SVP of Hotel Operations, he lacks relevant experience for that position, at least over the last 18 years.  And finally, Ocean's delay and refusal to return Callahan's Borgata phone is evidence of its intent to deprive Borgata of the information it needs to fully investigate Callahan's conduct.  *Id.*

Callahan's violation of the Employment Agreement is not limited to a violation of the restriction on competition, however.  The agreement also contains a confidentiality provision:

<u>Confidentiality</u>. In addition to Employee's common law obligations, at all times during Employee's employment with the Company, and at all times thereafter, Employee shall not, without the prior written consent of the Company's Chief Executive Officer, Chief Operating Officer or General Counsel in each and every instance--such consent to be within the Company's sole and absolute discretion--use, disclose or make known to any person, entity or other third party outside of the Company Group any Confidential Information belonging to Company Group or its individual members.

*See* <u>Exhibit "A"</u>, ¶ 8.3.

Upon information and belief, Callahan has used, and inevitably will use, the contents of Borgata's smartphone and/or his intrinsic knowledge of Borgata's confidential information and trade secrets in the performance of his job functions for Ocean. Indeed, it is for this specific reason that Ocean hired Callahan. In a "Ocean Casino Resort – Leadership Announcement", Ocean states that [Callahan] will utilize his 20+ year of casino/hotel experience to partner with our hotel and facilities teams to drive continual improvement and enhanced guest experiences. [Callahan] will also oversee tenant relations…During his 17 years at Borgata, [Callahan] honed his skills in marketing operations, relationship management, revenue management, property development projects and programs to enhance the guest experience." *See* Ocean Casino Resort – Leadership Announcement attached hereto as <u>Exhibit "E"</u>.

Since Callahan's departure from Borgata and beginning of employment with Ocean, five (5) more Borgata's employees have left Borgata and become employees of Ocean. These employees formerly worked closely with Callahan as a cohesive unit at Borgata and collectively made up a large portion of Borgata's casino marketing and hotel executives. *Id.*

Upon information and belief, Callahan is responsible for soliciting these individuals to work for Ocean. *Id.* By raiding Borgata's casino marketing and hotel executives in a concerted and rapid fashion, Ocean and Callahan have intentionally has sought to disrupt Borgata's casino operations and secure a critical mass of Borgata executives who are all familiar with the same confidential information and trade secrets of Borgata. Callahan, at the instruction of Ocean, has deliberately targeted and hired these Borgata casino marketing and hotel executives for the purpose of having them use their collective knowledge of Borgata's confidential information and trade secrets to unlawfully compete with Borgata. *Id.*

Finally, the Employment Agreement contains a non-solicitation provision.  In that provision, Callahan agreed that "at all times during Employee's employment with [Borgata], and for 12 months thereafter, Employee will not, without the prior written consent of [Borgata]:"

> (c)    approach, solicit, contract with or hire any current Business Contacts of Company Group or entice any Business Contact to cease his/her/its relationship with Company Group or end his/her employment with Company Group, without the prior written consent of Company, in each and every instance, such consent to be within Company's sole and absolute discretion.

*See* Exhibit "A", ¶ 8.2(c).

Callahan's solicitation and "poaching" of Borgata's employees is a direct violation of the Employment Agreement's non-solicitation provision. Ocean has tortiously interfered with the Employment Agreement by inducing and/or facilitating Callahan to do so.

**B. Ocean Has Hired Kelly Burke In Violation Of Her Employment Agreement With Borgata, And Through Burke Is Misappropriating Borgata's Trade Secrets And Other Confidential And Proprietary Information And Soliciting Borgata Employees In Violation Of Burke's Non-Solicitation Agreement.**

Like Callahan, Ocean has also solicited Kelly Ashman Burke. Ocean hired Burke with the job title of "Senior Vice President – Chief Marketing Officer".  *See* Exhibit "E". Based on the press release announcing her hire, Burke's position is, in form and function, the same job she performed while employed by Borgata.  Compl. ¶¶ 54-70.

Burke's job title at Borgata was "Executive Director of Marketing".  Burke's employment with Borgata was contractual, with the "Specified Term" of employment from July 19, 2017 through July 18, 2020. *See* Burke Employment Agreement attached hereto as Exhibit "F". Burke received considerable consideration for agreeing to the terms, provisions, and covenants therein in the form of an annual salary well over $100,000.00.  As Executive Director of Marketing, Burke was responsible for marketing strategy, including the use of customer loyalty databases and other information to contact customers and drive business.  *Id.*

Burke's Employment Agreement contained restrictive covenants, including non-solicitation, confidentiality, and non-competition provisions. *Id.* The restrictive covenant provisions of Burke's Employment Agreement and Callahan's Employment Agreement are identical. *Id.* By accepting employment at Ocean as the Senior Vice President of Marketing, she is in direct violation of the non-competition provisions of her Employment Agreement. Moreover, given her job duties, she will inevitably disclose Borgata's confidential information to Ocean and use those strategies and information to compete with Borgata. *Id.*

Burke, like Callahan, has also violated the no-solicitation provisions of her agreements. As set forth in the verified Complaint, Borgata is informed that Burke was personally involved in soliciting Herschel, O'Connor, Ebner, and Burch despite being aware that these former Borgata employees were still bound by New Jersey, federal, and common law from maliciously disclosing their actual and intrinsic knowledge of Borgata's confidential information and trade secrets. She, like Callahan, did so in an effort to recreate the team of executives that have successfully run Borgata's marketing and relationship marketing operations for several years.

**C. Borgata Has Attempted To Resolve The Dispute With Ocean, Callahan And Burke Without Filing Suit, But Those Efforts Have Failed. Defendants Have Refused To Comply With Their Agreements and Refused to Return Borgata Property. In Doing So, Ocean Has Precluded Borgata's Investigation And Confirmed Its Plan To Misappropriate Borgata's Customers And Trade Secrets.**

On August 20, 2020, the undersigned counsel for Borgata sent a cease and desist letter to Ocean's Senior Vice President and General Counsel, demanding that Ocean cease and desist from continuing to employ Callahan, Burke, and the other former Borgata employees named herein, as well as to cease and desist misappropriating Borgata's trade secrets and other confidential and proprietary information. Trimmer Decl., attached as <u>Exhibit G</u>. To date, Ocean has not complied with Borgata's demand to cease and desist its unlawful conduct.[2] To the contrary, Ocean has not addressed Borgata's position in writing. Through counsel it has contended that Callahan's job

---

[2]    Callahan has also taken the position that Borgata agreed to gift the phone to him. As set forth n the attached declarations from Melonie Johnson and Coleen Hermann, that claim is false. Ms. Hermann demanded that the phone be returned during a conversation on July 17, 2020, and at least at that time, Callahan said he would return it the following Monday, July 20, 2020.

title and responsibilities do not include casino marketing, and therefore he is not in violation of his employment agreement.  Ocean has not responded to Borgata's concerns about Burke, Herschel, O'Connor, Ebner and Burch.

Ocean also has refused to return Callahan's phone.  Through counsel, it has asserted (without authority or specificity) that the return of the phone could reveal privileged communications Callahan had with counsel regarding his plans to leave Borgata, and therefore Ocean must create a forensic image of the phone before returning it.  When Borgata offered to have the phone delivered to its third-party forensic examiner and requested that Callahan provide a privilege log so that privileged communications could be screened, Ocean did not respond.

To be clear, Ocean's refusal to return Callahan's phone is critically and unjustifiably interfering with Borgata's attempts to investigate Callahan's conduct.  On information and belief, Callahan and Ocean exchanged communications, terms of employment and other information in June 2020, and it appears that the parties devised a sham employment structure to create the impression that he was not violating his non-competition obligations.  Ocean's refusal to provide the phone deprives Borgata of the opportunity to investigate that claim and hampers its ability to provide additional evidence in support of this application for injunctive relief.  Indeed, as set forth in the attached policies, Callahan had no expectation of privacy in his phone or his use of Borgata email.  The assertion that any communication on the phone is privileged is not supported by law. Trimmer Decl.

## III.   **LEGAL ARGUMENT**

### A.   **Legal Standards**

Borgata has brought both federal and state law claims against Defendants.  The standard for injunctive relief under those claims is similar and set forth below.

#### 1.   *Standard for Injunctive Relief Under The DTSA*

In general, expedited equitable relief is available when the moving party can show: (1) that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor, and; (4) that an

injunction is in the public interest. *Alliance for The Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017); *Fernandez v. State of Nevada*, 2011 U.S. Dist. LEXIS 6103 at *2-3 (D. Nev Jan. 15, 2011) (citing Fed.R.Civ.P. 65).   The Defend Trade Secrets Act modifies the traditional test slightly because, in Section 1836(b)(2), it sets forth specific statutory criteria that entitle a moving party to injunctive relief.   That section provides that injunctive relief in the form of civil seizure may issue if the moving party's claims are 1) based on an affidavit or verified complaint; and (2) when an order providing for the seizure of property is necessary to prevent the propagation or dissemination of trade secrets subject to the action. To that end, the DTSA further provides that a seizure order is appropriate if (1) a traditional injunction pursuant to Fed.R.Civ.P. 65 would provide inadequate relief because the party to which the order would issue would evade, avoid, or otherwise not comply with such an order; (2) immediate and irreparable injury will occur if seizure is not ordered; (3) the harm to the applicant of denying the application outweighs the harm to the legitimate interest of the person against whom seizure would be ordered; (4) the information in question is a trade secret that has been misappropriated or subject to a conspiracy to misappropriate the trade secret by improper means; (5) the person against whom seizure would be ordered has actual possession of the trade secret; (6) the application describes with reasonable particularity the matter to be seized and, to the extent reasonable, the location; (7) the person against whom seizure would be ordered would destroy, move, hide, or otherwise make such matter inaccessible to the court if the applicant were to proceed on notice, and; (8) the applicant has not publicized the requested seizure. 18 U.S.C. § 1836(b)(2)(a)(ii).

2.   *Injunctive Relief Under Borgata's New Jersey Claims*

The Employment Agreements for Callahan and Burke contain the following provision:

Governing Law.   The laws of the State in which the Employer's principal place of business is located shall govern the validity, construction and interpretation of this Agreement, and except for Disputed Claims and subject to the Arbitrations provisions included herewith, exclusive jurisdiction over any claim with respect to this Agreement shall reside in the courts of the State of Nevada.

*See* Exhibit "A"; Exhibit "F", ¶ 16.

New Jersey law therefore applies to this case, and Borgata can meet its burden of proving each element required under New Jersey law for obtaining an injunction. *See Crowe v. De Gioia*, 90 N.J. 126, 447 A.2d 173 (1983) and N.J. R. 4. It is well established that interlocutory injunctive relief is appropriate where: (1) there is a threat of immediate and irreparable harm to the plaintiff if the injunction is not granted; (2) plaintiff's legal right underlying the claim is settled as a matter of law and the Plaintiff demonstrates a reasonable probability of eventual success on the merits, and; (3) in balancing the equities, the damages to the plaintiff in the absence of the injunction outweigh the foreseeable harm to the defendant. *Crowe*, 90 N.J. at 132-134; *Zoning Board of Adjustment v. Service Electric Cable TV.*, 198 N.J. Super. 370, 379 (App. Div. 1985).

**B.   Success on the Merits and Irreparable Harm**

Irreparable harm to Borgata is certain. Ocean, Callahan, and Burke are already in possession of Borgata's trade secrets, including Callahan's phone which functions as a comprehensive customer list of Borgata's highest-level patrons, as well as a repository of Borgata's marketing and business strategies. The nature of this action, based on disclosure of confidential information and trade secrets in violation of restrictive covenants, is *presumed* to cause irreparable if disclosure of trade secrets occurred due to inducement to breach a duty of secrecy. Because Borgata is also likely to show that Callahan and Burke have breached their employment agreements, the Court should issue a temporary restraining order.

*1.   Defend Trade Secrets Act*

The Defendant Trade Secrets Act ("DTSA")[3] creates a private right of action for the misappropriation of trade secrets. 18 U.S.C. § 1831, *et seq*. The DTSA permits the owner of a trade secret to bring a private cause of action in federal court for trade secret misappropriation. 18

---

[3] The New Jersey Trade Secrets Act, N.J.S.A. § 56:15-1 *et seq*. is virtually identical to the DTSA in all relevant regards.

U.S.C. § 1836(b)(1). "Trade secret" is broadly defined to include "all forms and types of financial, business, scientific, technical, economic, or engineering information," if the owner "has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

Under the DTSA, "misappropriation" is defined in several different ways. It includes the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" constitutes a misappropriation. 18 U.S.C. § 1839(5)(A). A misappropriation also occurs when one "disclos[es]" or "use[s]" another's trade secret without the consent of the trade-secret owner. 18 U.S.C. § 1839(5)(B). "Improper means" also includes theft, and breach or inducement of a breach of a duty to maintain secrecy. 18 U.S.C. § 1839(6).

It is well settled that a customer list, sales and marketing techniques, personal sensitive customer information, customer goodwill, future business prospects, and customer relationship information are trade secrets. *Frantz v. Johnson*, 116 Nev. 455, 466, 999 P.2d 351, 358 (2000) (a customer list can be a trade secret when extremely confidential and where the list was secret and guarded, where the list was missing after an employee had access to the list which went missing after the employee left his employment, then provided customers with "more competitive pricing"); *IDS Life Ins. O. v. SunAmerica*, 136 F.3d 537, 543 (7th Cir. 1998) (irreparable injury presumed for loss of customer goodwill, future business, customer relationships, business reputation and trade secrets).

Borgata took reasonable measures to maintain the secrecy of trade secrets on the smartphone it issued to Callahan, as well as the intrinsic knowledge of trade secrets known by

Callahan, Burke, Ted Herschel, Christopher O'Connor, Stephen Ebner, Ryan Burch. First, Borgata provided the smartphone to Callahan so that Borgata's trade secrets were not kept and stored on a personal smartphone owned by Callahan. Second, Borgata requested that Callahan return the smartphone when he ended his employment. Third, due to creating customer lists, customer information, customer good will, implementing and creating new marketing techniques, and business prospects, Callahan and Burke were bound by the non-competition, confidentiality, and non-solicitation provisions in their Employment Agreements. Borgata contractually bound Callahan and Burke in such a manner that prohibited them from disclosing Borgata's trade secrets, using them while employed by a competing casino, or soliciting Borgata's employees or customers.

Due to the personal nature of the relationships Callahan and Burke developed with patrons on behalf of Borgata, there is no plausible way a competitor, such as Ocean, could readily ascertain Borgata's particular marketing strategy in regard to its highest level patrons without Callahan and Burke disclosing that information to Ocean. Or, in this case, simply hiring Callahan who has a smartphone with the proverbial "keys to the kingdom" saved in it.

It is undeniable that misappropriation has occurred in several ways prohibited by the DTSA. Borgata's smartphone issued to Callahan was simply taken by Callahan without Borgata's permission. It is, in essence, a stolen item that neither Callahan nor Ocean have any right to possess, retain, or use. Theft or conversion is acquisition of a trade secret by improper means. 18 U.S.C. § 1839(6). Misappropriation by improper means also includes "breach or inducement of a breach of a duty to maintain secrecy." *Id.* Here, Callahan and Burke both retain intrinsic knowledge of Borgata's trade secrets even without possession of Callahan's smartphone. Ocean's employment of them in positions in which they perform the same job functions that they previously performed for Borgata induces Callahan and Burke to use their knowledge of

Borgata's trade secrets. Finally, both Callahan and Burke have contractual duties to maintain secrecy, as set forth in their Employment Agreements. Ocean's hiring of Callahan and Burke caused them to breach the non-competition, confidentiality, and non-solicitation provisions of their Employment Agreements – inducement and actual breach of their duty to maintain secrecy.

Callahan and Burke's breach of their Employment Agreements, and Ocean's tortious interference with those obligations, demonstrate that all three Defendants have engaged in misappropriation of trade secrets by improper means. If Callahan and Burke breached their Employment Agreements with Borgata due to Ocean's tortious interference, there is a presumption of irreparable harm.

### 2.    Breach of Contract

New Jersey law has long recognized the enforceability of restrictive covenants such as those contained in Callahan and Burke's Employment Agreements. *See, e.g., Heuer v. Rubin*, 1 N.J. 251, 62 A.2d 812 (1949). To be enforceable, a restrictive covenant "must protect a legitimate interest of the employer; it may impose no undue hardship on the employee; and it must be in the public's interest." *Coskey's Television & Radio Sales and Servs., Inc. v. Foti*, 253 N.J. Super. 626, 634, 602 A.2d 789, 793 (App. Div. 1992) (citing *Solari Indus., Inc. v. Malady*, 55 N.J. 571, 576 (1970)). In addition, a restrictive covenant must be "limited in its application concerning its geographical area, its period of enforceability, and its scope of activity." *Id.* Under these guidelines, the restrictive covenants contained in the Employment Agreements are enforceable.

The restrictive covenants at issue in the Employment Agreements protect Borgata's legitimate interest in maintaining the confidentiality of its non-public business information and protecting its relationships with its customers. "New Jersey law is plain that employers have 'a legitimate interest in preventing the disclosure of confidential information as well as protecting customer relationships." *Chemetall US, Inc. v. Laflamme*, 2016 WL 885309, *9 (D. N.J. 2016).

*See also, HR Staffing Consultants LLC v. Butts*, 627 Fed. Appx. 168, 172 (3d Cir. 2015) (applying NJ law and holding that protecting relationships with customers and confidential information are legitimate interests to uphold a non-compete); *Cmty. Hosp. Grp., Inc. v. More*, 869 A.2d 884, 897 (N.J. 2005) (legitimate interests include "protecting confidential business information and customer lists); *Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879, 892 (N.J. 1988) (employers have a legitimate interest "in protecting trade secrets, confidential information, and customer relations," and they may also "have legitimate interests in protective information that is not a trade secret or proprietary information," such as "highly specialized, current information not generally known in in the industry, created and stimulated by the research environment furnished by the employer to which [an] employee has been 'exposed' or 'enriched' solely due to his employment.").

   "An employee must show more than mere 'personal hardship' for the court to find an undue hardship would exist if a particular non-competition restriction is enforced." *National Reprographics, Inc. v. Strom, et al., 621 F.Supp.2d 204, 228* (D.N.J. 2009). In determining the existence of an undue hardship, a court should consider the reason for the termination of the employment agreement between the parties. *Id.* "Where the breach results from the desire of an employee to end his relationship with the employer rather than from any wrongdoing on the part of the employer, a court should be hesitant to find undue hardship [on the employee]." *Id.* Here, both Callahan and Burke unilaterally ended their employment with Borgata.

   In New Jersey, restrictive covenants running for a period of two (2) years following the end of employment have been found to be enforceable. *See Mailman, Ross, Toyes & Shapiro v. Edison*, 183 N.J. Super 434 (Ch. Div. 1982) (holding a covenant for a term of two years is reasonable); *Trico Equip., Inc. v. Manor*, 2009 WL 1687391, at *7 (D.N.J. June 15, 2009) ("Here, both the non-compete and non-solicitation provisions apply for a two year period after employment, a period that New Jersey courts have found to be reasonable.") (collecting cases). In

this matter, Callahan and Burke were only enjoined from employment with competing casinos for a period of one (1) year.

Finally, the geographic scope for non-competition within Callahan and Burke's Employment Agreement is objectively reasonable as it is tailored specifically to prohibit Callahan and Burke from joining competing casinos. Even if this Court were to find the geographic scope to be overbroad, New Jersey has evolved from invalidating overbroad restrictive covenants outright to presumptively "compress[ing] or reduc[ing]" their scope "so as to render the covenants reasonable." *Karlin v. Weinberg*, 390 A.2d 1161, 1168 n.4 (N.J. 1978); *see Maw v. Advanced Clinical Commc'ns, Inc.*, 846 A.2d 604, 608-09 (N.J. 2004). In this matter, Callahan and Burke joined Ocean, a direct competitor to Borgata, that is located 1.5 miles from Borgata in the same city. The Employment Agreements specifically prohibit employment with other casinos in Atlantic City. Under the actual factual circumstances of this matter, the geographic scope with the Employment Agreements is reasonable.

In summary, Callahan and Burke are in breach of the non-competition, confidentiality, and non-solicitation provisions of the Employment Agreements.  Because Callahan has willfully refused to turn over his phone, thereby shielding his misconduct, the Court should presume that the phone contains affirmative evidence that he has violated his contractual and statutory obligations, and should impute those acts to his new employer, Ocean.

### 3.    *Tortious Interference*

A claim of tortious interference is established by the following elements: (1) plaintiff had a reasonable expectation of an economic advantage; (2) defendants' actions were malicious in the sense that the harm was inflicted intentionally and without justification or excuse; (3) there is a reasonable probability that plaintiff would have obtained the anticipated economic benefit but for the interference, and; (4) economic damage has resulted. *See Printing Mart-Morristown v. Sharp*

*Elec. Corp.*, 116 N.J. 739, 751-52 (1989); *Well v. Express Container Corp.*, 360 N.J. Super. 599, 613-14 (App. Div. 2003), *cert. den.*, 177 N.J. 574 (2003); *C & J Colonial Realty, Inc. v. Poughkeepsie Savings Bank*, 355 N.J. Super. 444, 478 (App. Div. 2002), *cert. den.*, 176 N.J. 73 (2003).

Borgata had a reasonable expectation that Callahan and Burke were going to abide by the restrictive covenants in their Employment Agreements, as Borgata provided them generous annual salaries in consideration for their agreement to do so. Ocean's act in soliciting and hiring Callahan and Burke in violation of the Employment Agreements was deliberate and malicious – Ocean's only plausible reason for hiring Callahan and Burke would be to make use of their intrinsic knowledge of Borgata's confidential information and trade secrets. Without Ocean's interference, Borgata reasonably anticipated it would receive the benefit of its bargain with Callahan and Burke. If Ocean had simply not hired them, neither Callahan nor Burke would be in violation of the Employment Agreements. Actual damages have resulted from the tortious interference and breach as Borgata provided ample consideration to Callahan and Burke for their agreement to abide by the restrictive covenants. Future damages will continue to accrue as Callahan and Burke make use of their knowledge of Borgata's confidential information and trade secrets to directly compete for business that would otherwise flow to Borgata.

Further, Callahan and Burke have induced Ted Herschel, Christopher O'Connor, Stephen Ebner, Ryan Burch to leave Borgata. Borgata had a reasonable expectation that Callahan and Burke would abide by the non-competition and non-solicitation provisions in their Employment Agreements.  In using Callahan and Burke to recruit Borgata's marketing and casino executives in violation of their Employment Agreements, Ocean has perpetrated a deliberate malicious act to harm Borgata and irreparably harm its ability to compete.

#### 4.      Irreparable Harm

There is a *presumption* of irreparable harm in a plurality of courts under these circumstances. Irreparable harm is presumed in situations where a confidentiality agreement or restrictive covenant has been breached or trade secrets have been misappropriated. *Gallagher Benefits Servs., Inc. v. De La Torre*, No. C 07-5495 VRW, 2007 WL 4106821, at *5 (N.D. Cal. Nov. 16, 2007) ("In general, the imminent use of a trade secret constitutes irreparable harm."); *aff'd in relevant part*, 283 F. App'x 543 (9th Cir. 2008); *LifeCell Corp. v. Tela Bio, Inc.*, 2015 N.J. Super. Unpub. LEXIS 1608, at *85 (Sup. Ct. Ch. Div.) ("In the context of non-competition agreements, irreparable injury may be shown if the former employee may avail himself of sensitive product strategies both as to development and marketing, which may be of extreme value to the competitor.") (citing *Scholastic Funding Grp., LLC v. Kimble*, 2007 U.S. Dist. LEXIS 30333, *20 (D.N.J. April 24, 2007)); *Western Directories, Inc. v. Golden Guide Directories, Inc.*, No. C 09-1625 CW, 2009 WL 1625945, *6 (N.D. Cal. June 8, 2009) ("The Court presumes that Plaintiff will suffer irreparable harm if its proprietary information is misappropriated."); *Vinyl Interactive, LLC v. Guarino*, No. C 09-0987 CW, 2009 WL 1228695, at *8 (N.D. Cal. May 1, 2009) (same); *Teleflora, LLC v. Florists' Transworld Delivery, Inc.*, No. C 03-05858 JW, 2004 WL 1844847, at *6 (N.D. Cal. Aug. 18, 2004) ("Use or disclosure of trade secrets is an irreparable harm which will support the granting of a preliminary injunction."); *Advanced Instructional Sys., Inc. v. Competentum USA, Ltd.*, No. 1:15CV858, 2015 WL 7575925, at *4 (M.D. N.C. Nov. 25, 2015) ("In most instances, courts presume irreparable harm when a trade secret has been misappropriated."); *Pixon Imaging, Inc. v. Empower Techs. Corp.*, No. 11-CV-1093-JM MDD, 2011 WL 3739529, at *6 (S.D. Cal. Aug. 24, 2011) ("[A]n intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always show irreparable harm."); *EchoMail, Inc. v. American Exr. Co.*, 378 F. Supp. 2d 1, 4 (D. Mass.

2005); *FMC Corp v. Taiwan Tainan Giant Indus. Co., Ltd.*, 730 F.2d 61, 63 (2nd Cir. 1984) (trade secrets, once lost, is lost forever; its loss cannot be measured in money damages); *Ivy Mar Co. v. C.R. Seasons, Ltd.*, 907 F. Supp. 547, 566 (E.D. N.Y. 1995); *Computer Assoc., Inc. v. Bryan*, 784 F. Supp. 982, 986 (E.D. N.Y. 1992); *Refractory Technology, Inc. v. Koski*, 1990 WL 119560, at *3 (N.D. Ill., Aug. 13, 1990) (loss of trade secret would cause plaintiff immediate, irreparable harm); *ISC-Bunker Ramo Corp. v. Altech, Inc.*, 765 F. Supp. 1310, 1338 (N.D. Ill. 1990) ("it is often difficult to …. Determine the monetary damages suffered thereby"); *CPG Prod. Corp. v. Mergo Corp.*, 214 U.S.P.Q. 206, 2145 (S.D. Ohio 1981) (the threat of disclosure, destruction, or dilution of trade secret constitutes irreparable injury justifying injunctive relief); *Donald McElroy, Inc. v. Delany*, 72 Ill. App. 3d 285, 294-95, 389 N.E.2d 1300, 1308 (1st Dist. 1979) ("Once a protectable interest has been established, injury to plaintiff will presumably follow if that interest is not protected…threat of irreparable harm sufficient where former employee violated the terms of a non-disclosure agreement and was about to use confidential information against the plaintiff, irreparable injury was shown and preliminary injunction was properly granted).

Loss of goodwill, destruction of trade secrets, loss of client confidentiality and competitive disadvantage constitute irreparable harm for which no adequate remedy at law exists. *IDS Life Ins. O. v. SunAmerica,* 136 F.3d 537, 543 (7th Cir. 1998) (irreparable injury presumed for loss of customer goodwill, future business, customer relationships, business reputation and trade secrets).

## C.    Public Interest and Balance of Equities

It is well settled that there is a legitimate public interest in enforcement of contracts and preventing tortious interference with them, and employment contracts that contain restrictive covenant provisions in particular. "The public has a clear interest in safeguarding fair commercial

practices and in protecting employers from theft or piracy of trade secrets, confidential information, or, more generally, knowledge and technique in which [the] employer may be said to have a proprietary interest…the public has a great interest in upholding and enforcing freely negotiated contracts entered into between employers and their employees." *National Reprographics, Inc. v. Strom, et al.*, 621 F.Supp.2d 204, 228 (D.N.J. 2009). Additionally, the public interest as it relates to this action is clearly enshrined by statute in the Defend Trade Secrets Act, which specifically permits the use of civil proceedings for injunctive relief and even *ex parte* injunctive relief. 18 U.S.C. § 1836(b).

Borgata has shown that the balance of the equities tips in its direction. *Prof'l Beauty Fed'n. of Cal. v. Newsom*, No. 2:20-cv-04275-RGK-AS, 2020 U.S. Dist. LEXIS 102019, at *24-25 (C.D. Cal. June 8, 2020). Borgata's Complaint and this motion establish that Ocean has conducted a wholesale raid on Borgata's marketing and casino executives. In doing so, Ocean has tortiously interfered with the Employment Agreement of Callahan and Burke, and further induced Callahan and Burke to violate their Employment Agreements by soliciting additional Borgata employees with intrinsic knowledge of Borgata's trade secrets. In addition, Callahan, by and for the benefit of Ocean, retains Borgata's smartphone issued to him in the performance of his job functions for Borgata.

It is self-evident that Borgata will be harmed by Callahan continuing to possess, retain, and use Borgata's smartphone for the benefit of Ocean. Neither Ocean nor Callahan will suffer any cognizable harm by simply being ordered to immediately return the smartphone to Borgata.

An order for Callahan and Burke to cease their employment with Ocean is not unjust. They specifically agreed not to work for, in relevant part, competing casinos in Atlantic City. They suffer no cognizable harm by being ordered to comply with contractual obligations in the Employment Agreements to which they already willingly agreed to be bound.  And, an order for

Ocean to discontinue employing Callahan and Burke will not result in any harm to Ocean. Indeed, it is Borgata that has been harmed by Ocean's conduct in tortiously interfering with Callahan and Burke's Employment Agreements with Borgata. Ocean was well-aware of Employment Agreements prior to hiring Callahan and Burke and could not reasonably expect that its illegal conduct would be permitted to continue by this Court. The sole reason for their employment is to advance Ocean's use and misappropriation of Borgata's trade secrets and their continued employment is presumed to cause Borgata irreparable harm.

## IV.    CONCLUSION

For each and all of the reasons stated above, Borgata respectfully requests that the Court grant its Motion for a Temporary Restraining Order and Preliminary Injunction in the form of the enclosed proposed order.

DATED this 27th day of August, 2020.

JACKSON LEWIS P.C.


/s/ *Paul T. Trimmer*
PAUL T. TRIMMER
Nevada Bar No. 9291
300 S. Fourth Street, Ste. 900
Las Vegas, Nevada 89101

John M. Nolan III (pro hac vice in progress)
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA  19102
T: (267) 319-7802
F: (215) 399-2249
J.Michael.Nolan@jacksonlewis.com

*Attorneys for Plaintiff*
*Marina District Development*
*Company, LLC d/b/a Borgata Hotel Casino*
*& Spa*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I am an employee of Jackson Lewis P.C., and that on this 27th day of August, 2020, I caused to be served via the Court's CM/ECF Filing, a true and correct copy of the foregoing **MOTION FOR TEMPORARY RESTRAINING ORDER** properly addressed to the following:

Leigh Ann Buziak
BLANKROME
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
lbuziak@blankrome.com

Attorneys for Defendants


_____*/s/ Paul T. Trimmer*_____
Employee of Jackson Lewis P.C.