**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| MARINA DISTRICT DEVELOPMENT COMPANY, LLC d/b/a BORGATA HOTEL CASINO & SPA, | Case No.: 2:20-cv-01592-GMN-BNW |
| Plaintiff, | **ORDER** |
| vs. | |
| AC OCEAN WALK, LLC d/b/a OCEAN CASINO RESORT; WILLIAM CALLAHAN; KELLY ASHMAN BURKE, | |
| Defendants. | |

Pending before the Court is Plaintiff Marina District Development Company, LLC's ("Plaintiff's") Motion for Temporary Restraining Order, ("TRO"), (ECF No. 2). Defendants AC Ocean Walk, LLC ("Ocean"), Kelly Ashman Burke ("Burke"), and William Callahan ("Callahan"), (collectively, "Defendants") filed Responses, (ECF Nos. 15–16), and Plaintiff filed a Reply, (ECF No. 23). For the reasons discussed below, the Court **GRANTS in part** and **DENIES in part** Plaintiff's Motion.

I. **BACKGROUND**

This case arises from the circumstances surrounding Plaintiff's loss of several employees to Ocean, a competing casino in Atlantic City, New Jersey. Plaintiff, a hotel and casino in Atlantic City, previously employed Defendants Callahan and Burke. (*See* Verified Compl. ("Compl.") ¶¶ 1, 3, 13, 55, ECF No. 1).[1] Callahan worked as Plaintiff's Vice President of Relationship Marketing. (*Id.* ¶ 14). In that role, Callahan was responsible for developing and maintaining business relationships with many of the individuals who gambled over $1 million

---

[1] A TRO can be supported by a verified complaint. Fed. R. Civ. P. 65(b)(1)(A); *see Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011) ("verified complaint may be treated as an affidavit, and, as such, it is evidence that may support injunctive relief").

per visit with Plaintiff. (*Id.* ¶¶ 15, 27). As a result, Callahan developed close personal relationships with Plaintiff's highest-level guests and learned their preferences regarding credit, large loss discounts, gaming rule changes, hospitality, and other considerations that provided Plaintiff a competitive advantage in having these players consistently return to its casino. (*Id.* ¶¶ 16, 18–19, 32). Callahan allegedly communicated with these individuals through his Plaintiff-issued cellphone, which Callahan has not returned in violation of Plaintiff's technology-use policies. (*Id.* ¶¶ 20–29). Plaintiff alleges that the phone contains "highly sensitive information in the gaming industry and is the exact type of information that could be used by ["Plaintiff's"] competitors to sway high level players and corporate clientele to patronize their hotels and casinos." (*Id.* ¶ 30).

Plaintiff alleges that the Employment Agreement between Plaintiff and Callahan subjected Callahan to restrictive covenants including non-solicitation, confidentiality, and non-competition provisions. (*Id.* ¶ 33). Callahan's confidentiality agreement specifically identifies information that he acquires through relationships made in the course of his employment with Plaintiff as "Confidential Information" he is prohibited from disclosing to individuals outside of Plaintiff. (*Id.* ¶¶ 34, 43); (*see also* Callahan Employment Agreement ¶ 8, Ex. A to Compl., ECF No. 1-1). Callahan's non-competition agreement prohibits him, for a period of twelve months, from providing services to a competitor of Plaintiff that are in any way similar to the services Callahan performed for Plaintiff. (*Id.* ¶ 35–37); (*see* Callahan Employment Agreement ¶ 8.1). However, Callahan accepted a job with a competitor, Ocean, on or about July 22, 2020. (*Id.* ¶ 39). Plaintiff alleges on information and belief that Callahan's work for Ocean overlaps with the work he did for Plaintiff because he continues to manage high-level players' guest experiences. (*Id.*). Plaintiff further alleges that Callahan holds a sham-title of "Senior Vice President of Hotel Operations" to mask the similarity of his job duties. (*Id.* ¶ 40). Plaintiff

alleges that Callahan has used Plaintiff's trade secrets that are in Callahan's inherent possession and on his smartphone in service of Ocean. (*Id.* ¶¶ 45–46).

Plaintiff also alleges that Callahan recruited five of Plaintiff's former employees to work for Ocean in violation of Callahan's non-solicitation agreement. (*Id.* ¶¶ 47–53). Plaintiff identifies Burke as one such employee. (*Id.* ¶ 54). Burke previously worked for Plaintiff as its Executive Director of Marketing. (*Id.* ¶ 57). As Plaintiff's employee, Burke's duties included "devising and executing marketing strategies including advertising, brand development, direct mail, promotional offers, special events and gift giveaways to direct revenues, including use of Company's M Life database." (*Id.* ¶ 58). Plaintiff alleges that, based on Burke's experience with Plaintiff, Burke has extensive knowledge of Plaintiff's customer database, which is highly valuable to competitors. (*Id.* ¶¶ 59–60). Like Callahan, Burke was also subject to non-solicitation, confidentiality, and non-competition agreements. (*Id.* ¶¶ 61–63). Plaintiff alleges that Burke breached her non-competition and confidentiality agreements by accepting a senior marketing position with Ocean, which has many overlapping job duties as those Burke held with Plaintiff. (*Id.* ¶¶ 64–67). Plaintiff now moves for a TRO directing Callahan's phone be returned to Plaintiff, enjoining Callahan and Burke from working for Ocean, directing all Defendants to cease misappropriating Plaintiff's trade secrets, and granting expedited discovery. (*See generally* Mot. TRO, ECF No. 2).

## II. LEGAL STANDARD

The same legal standard applies to both temporary restraining orders and preliminary injunctions sought pursuant to Federal Rule of Civil Procedure 65. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that the analysis applied to temporary restraining orders and preliminary injunctions is "substantially identical"). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*,

555 U.S. 7, 24 (2008). A court may grant such relief only upon a petitioner's showing of (1) likelihood of success on the merits, (2) likelihood of irreparable harm in the absence of preliminary relief, (3) the balance of equities weighs in petitioner's favor, and (4) an injunction is in the public interest. *Id.* at 20. A temporary restraining order is distinguished by its "underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974); *see also* Fed. R. Civ. P. 65(b) (limiting temporary restraining orders to 14 days unless extended for good cause, and providing for expedited hearings on preliminary injunctions).

"The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (citing 11 C. Wright and A. Miller, Federal Practice and Procedure, Civil, § 2949 at 471 (1973)).

## III. DISCUSSION

### A. Likelihood of Success on the Merits

Plaintiff's Complaint asserts claims for: (1) Trade Secret Misappropriation under the federal Defend Trade Secrets Act ("DTSA") and New Jersey Trade Secrets Act ("NJTSA") against all Defendants; (2) Breach of Contract against Burke and Callahan; and (3) Tortious Interference against Callahan and Ocean.[2] (Compl. ¶¶ 86–100, 106–128). The Court's below

---

[2] The Complaint also raises claims for Declaratory Relief, Unfair Competition, and federal RICO violations against all Defendants. (Compl. ¶¶ 92–105, 129–140). However, Plaintiff does not raise these claims in the Motion for TRO as claims for which Plaintiff has a likelihood of success on the merits. (*See* Mot. TRO 15:22–21:26). The Court therefore does not consider the claims for the purpose of its TRO analysis.

discussion first addresses Plaintiff's likelihood of success on the merits of its trade secret misappropriation claims.

### i. Trade Secret Misappropriation

Plaintiff asserts that all Defendants have misappropriated and continue to misappropriate Plaintiff's trade secrets under the DTSA and NJTSA. (*See* Compl. ¶¶ 106–117). In order to state a claim for trade secret misappropriation under the DTSA, Plaintiff must allege: (1) Plaintiff possessed a valuable trade secret; (2) Defendants misappropriated the trade secret through unlawful acquisition, use, or disclosure of the trade secret; and (3) the misappropriation was made in breach of an express or implied contract or by a party with a duty not to disclose. *See* 18 U.S.C. § 1839; *see also Physician's Surrogacy, Inc. v. German*, No. 17-cv-718-MMA, 2018 U.S. Dist. LEXIS 16261, 2018 WL 638229, at *4–*5 (S.D. Cal. Jan. 31, 2018); *Switch Ltd. v. Fairfax*, No. 2:17-cv-02651-GMN-VCF, 2018 WL 4181626, at *3 (D. Nev. Aug. 30, 2018). The NJTSA requires that, "a plaintiff must show the following: '(1) the existence of a trade secret, (2) communicated in confidence by the plaintiff to the employee, (3) disclosed by the employee in breach of that confidence, (4) acquired by the competitor with knowledge of the breach of confidence, and (5) used by the competitor to the detriment of the plaintiff.'" *Oakwood Labs., LLC v. Thanoo*, No. 3:17-cv-05090-PGS-LHG, 2019 U.S. Dist. LEXIS 183347, 2019 WL 5420453, at *3 (D.N.J. Oct. 23, 2019) (quoting *Givaudan Fragrances Corp. v. Krivda*, No. 08-4409, 2013 U.S. Dist. LEXIS 153437, 2013 WL 5781183, at *4 (D.N.J. Oct. 25, 2013)).[3]

---

[3] Plaintiff alleges that the NJTSA is "virtually identical" to the DTSA in all relevant regards. (*See* Mot. TRO 15:23 n.3). However, Plaintiff ignores that the NJTSA also requires demonstrating that a competitor *used* Plaintiff's trade secret to Plaintiff's detriment. Because Plaintiff has not briefed this essential element of its state-law claim, the Court need not analyze Plaintiff's NJTSA claim further as Plaintiff has not shown a likelihood of success on the merits. Therefore, the Court's remaining trade secret misappropriation analysis is confined to the DTSA.

The definition of "trade secret" is broad and includes all business information if "(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). "Misappropriation" under the DTSA includes theories of acquisition, disclosure, or use. *See* 18 U.S.C. § 1839(5); *see also Physician's Surrogacy, Inc. v. German*, No. 17-cv-718-MMA, 2018 U.S. Dist. LEXIS 16261, 2018 WL 638229, at *4–*5 (S.D. Cal. Jan. 31, 2018). A defendant unlawfully acquires a trade secret if he "knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5)(A). "Improper means" include, "theft, bribery, misrepresentation, [or] breach or inducement of a breach of a duty to maintain secrecy . . . ." 18 U.S.C. § 1839(6)(A). A defendant may also misappropriate a trade secret through use or disclosure thereof without express or implied consent under certain circumstances. *See* 18 U.S.C. § 1839(5)(B).

The Court first considers the alleged trade secrets at issue. The parties do not dispute that Plaintiff possesses some trade secrets that may be within Callahan's Plaintiff-issued smartphone or known by Callahan and Burke. Rather, Defendants allege that Plaintiff's failure to identify the at-issue trade secrets with particularity is fatal to Plaintiff's claim.[4] (Ocean Resp. 10:5–6, ECF No. 15); (Callahan and Burke ("Employees") Resp. 17:1–3, 17:22–19:5, ECF No. 16). The Court generally agrees that the Motion for TRO does not clearly state what is within

---

[4] Burke and Callahan briefly argue that Plaintiff may not have taken reasonable steps to secure the information's secrecy because not all of Plaintiff's employees were subject to confidentiality agreements. (Employees' Resp. TRO 18:16–19:4). If Plaintiff is correct that O'Connor, Ebner, and Burch held some of Plaintiff's trade secrets, and if those are the same or similar trade secrets as those held by Burke and Callahan, then Burke and Callahan may be correct because there is no indication the three were ever subject to confidentiality agreements or non-competition agreements. (*See* Yeager Decl. ¶ 15, Ex. 1 to Ocean Resp. TRO, ECF No. 15-1). However, based on the evidence presently before the Court, the Court cannot conclude that the trade secrets held by Callahan and Burke were not subject to reasonable efforts to maintain secrecy.

Page 6 of 17

the scope of Plaintiff's allegedly misappropriated trade secrets. (*See* Mot. TRO 16:16–18:10). However, given the broad definition of trade secret, the Court does not find Plaintiff's failure to identify its trade secrets with particularity is fatal to Plaintiff's claim. The Complaint and Motion for TRO allege that Plaintiff's misappropriated trade secrets encompass Plaintiff's "marketing strategy," which at minimum includes Plaintiff's customer lists of its highest-spending players and those players' gaming, credit, and hospitality preferences. (*See id.* 16:26–17:12); (*see also* Compl. ¶¶ 108–110). Customer lists are generally regarded as trade secrets. *See Frantz v. Johnson*, 999 P.2d 351, 358 (Nev. 2000); *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 543 (7th Cir. 1998). Those players' identities and their preferences are subject to the confidentiality provisions in Burke and Callahan's employment agreements, which indicates Plaintiff's reasonable efforts to maintain the information's secrecy. (*See, e.g.*, Callahan Employment Agreement ¶¶ 8, 8.2(c)). Accordingly, the core issue in dispute is whether Plaintiff can demonstrate a likelihood of success on the merits that Defendants have misappropriated Plaintiff's trade secrets.

Plaintiff alleges that Defendants acquired the trade secrets in two ways: (1) the "intrinsic knowledge" of Burke, Callahan, and other solicited employees[5]; and (2) the information contained in Callahan's Plaintiff-issued cellphone. (*See* Mot. TRO 16:26–18:10); (*see also* Compl. ¶¶ 108–116). Plaintiff alleges that Burke, Callahan, and the solicited employees have "intrinsic knowledge" of Plaintiff's most important customers' preferences, and all of the employees have conspired to misappropriate those trade secrets. (*See* Compl. ¶¶ 16, 111–12, 115–16). Plaintiff alleges that it took reasonable measures to protect this intrinsic knowledge by subjecting Burke and Callahan to contracts "that prohibited them from disclosing [Plaintiff's] trade secrets, using them while employed by a competing casino, or soliciting

---

[5] Plaintiff alleges that Callahan also solicited Ted Herzchel, Christopher O'Connor, Stephen Ebner, and Ryan Burch (collectively, the "solicited employees") to work for Ocean. (Compl. ¶ 68).

[Plaintiff's] employees or customers." (Mot. TRO 17:8–11). Plaintiff asserts that "there is no plausible way a competitor, such as Ocean, could readily ascertain [Plaintiff's] particular marketing strategy in regard to its highest level patrons without Callahan and Burke disclosing that information to Ocean." (*Id.* 17:12–16). Plaintiff also asserts that Burke and Callahan are misappropriating its trade secrets by working in positions with the same functions as those Defendants held with Plaintiff. (*Id.*17:25–18:2).

The Court finds that Plaintiff's allegations support a claim to injunctive relief for trade secret misappropriation against Callahan, only. The Court first considers Plaintiff's allegation that Callahan misappropriated Plaintiff's trade secrets by soliciting Ebner, O'Connor, and Burch.[6] Plaintiff does not provide evidence that the intrinsic knowledge these employees possessed are trade secrets because Plaintiff has provided no evidence of the information held by these employees, or that the employees were subject to confidentiality agreements or other reasonable efforts to maintain the information's secrecy. (*See* Compl. ¶ 71) (alleging they were bound by New Jersey, federal, and Common law to not disclose Plaintiff's trade secrets). To the contrary, Ocean's Vice President of Human Resources has attested that, to the best of her knowledge, Ebner, O'Connor, and Burch were not subject to confidentiality agreements. (Yeager Decl. ¶ 15, Ex. 1 to Ocean Resp. TRO, ECF No. 15-1). Thus, these employees' intrinsic knowledge is not subject to trade secret protection.

The Court now turns to Callahan and Burke—the only Ocean employees named as Defendants in the case. Plaintiff alleges that Callahan, who served as its Vice President of Relationship Marketing, had extensive knowledge of Plaintiff's top customers who gambled approximately $1.5–$4 million per visit. (Compl. ¶¶ 14–17). During his time with Plaintiff, Callahan allegedly developed extensive relationships with Plaintiff's customers and learned

---

[6] Plaintiff also alleges that Callahan solicited Ted Hezchel, another employee subject to restrictive covenants. (Compl. ¶ 70). However, Plaintiff does not allege what position Hezchel holds with Ocean and what trade secrets he may possess.

their "particular wants and needs, permissions sought, accommodation preferences, schedules, gaming habits, credit requirements, comp requirements, and staffing preferences." (*Id.* ¶¶ 19, 32). Callahan's knowledge of Plaintiff's trade secrets was allegedly compounded by Callahan having retained his work phone, which contained the contact information of Plaintiff's top customers as well as text message conversations describing their preferences. (*Id.* ¶ 20). Callahan's intrinsic knowledge of Plaintiff's guests and the information on the Plaintiff-issued phone were allegedly subject to reasonable efforts to maintain their secrecy because: (1) Callahan was subject to a confidentiality agreement that encompassed information learned through customer relationships; and (2) Callahan was subject to a non-competition agreement that did not allow him to work in a substantially similar capacity with a competitor for twelve months. (*Id.* ¶¶ 34–37). Plaintiff alleges that Callahan misappropriated Plaintiff's trade secrets by (1) using his knowledge of customer preferences in service of Ocean by attempting to recruit Plaintiff's customers to play at Ocean; and (2) doing so on his improperly retained work phone. (*Id.* ¶¶ 20, 34, 44–46).

Callahan responds[7] that Plaintiff's allegations against him about contacting Plaintiff's customers are speculative, and his new job with Ocean—Senior Vice President of Hotel Operations—is not in violation of his non-compete because he does not perform substantially similar functions. (Employees' Resp. 8:11–9:25); (Yeager Decl. ¶ 6); (Callahan Decl., Ex. 2 to Employees' Resp. TRO, ECF No. 16-2). The Court need not reach the issue of whether Callahan is serving in a similar position because Plaintiff provides a sworn declaration from James Bruno, Plaintiff's Vice President of Casino Operations, that several top customers either told him Callahan had solicited them to play at Ocean or did in fact leave Plaintiff to play at

---

[7] Plaintiff also argues that the Court should disregard Burke and Callahan's Response because it was submitted shortly after the deadline in violation of the local rules. (*See* Pls.' Reply 4:6–5:9). Notably, if Plaintiff wanted the Court to strike the response as untimely, Plaintiff was required to file the request for relief as a separate document; a rule it should be familiar with for having disregarded it once already in this case. *See* LR IC 2-2(b); *see also* Clerk's Notice, ECF No. 6.

Ocean. (*See* Bruno Decl. ¶¶ 5–11, ECF No. 12). Plaintiff also provides evidence that the phone bill associated with Callahan's Plaintiff-issued phone confirms that Callahan contacted several of Plaintiff's top customers. (Turner Decl. ¶¶ 5–16, ECF No. 13). The evidence suggests that even if Callahan could perform his job with Ocean without violating his non-competition agreement, he has likely engaged in behavior that violates both his confidentiality and non-competition agreements. The conduct violates the DTSA because it is the nonconsensual use of a trade secret in breach of a duty to maintain the information's secrecy. *See* 18 U.S.C. § 1839(5)(b)(ii)(II). The Court therefore finds that Plaintiff has shown a likelihood of success on the merits of its trade secret misappropriation claim against Callahan. However, Plaintiff has not produced evidence that Ocean knew about the conduct or otherwise induced the customer contacts, and the evidence before the Court does not show a likelihood of success against Ocean. Ocean represents that it informed Callahan that it expected him to abide by any restrictive covenants he entered with Plaintiff. (Yeager Decl. ¶ 11).

The Court next reviews Plaintiff's allegations against Burke. Plaintiff alleges that Burke breached her non-competition agreement by accepting a marketing position with Ocean after having held a marketing position with Plaintiff, which will inevitably result in the disclosure of Plaintiff's trade secrets. (*See* Compl. ¶¶ 59–67). Plaintiff also alleges that Ocean misappropriated plaintiff's trade secrets by inducing Plaintiff to breach her non-competition agreements and confidentiality agreements. (*Id.* ¶ 74). Accordingly, the trade secret misappropriation allegations against Burke and Ocean present the same issues as whether Burke breached her non-competition or confidentiality agreements.

Burke does not argue that her role with Ocean complies with her non-competition agreement with Plaintiff. Instead, Burke responds that she is exempt from her non-competition agreement because she followed the procedures of the Employee Good Cause Termination provision of her Employment Agreement. (Employees Resp. 10:1–11:16). She alternatively

argues that whether she is exempt from her non-competition agreement under the Good Cause Termination provision is subject to arbitration, and issues of arbitrability should be left to the arbitrator. (*Id.* 11:17–22).

Section 10.3 of Burke's Employee Agreement provides a provision for an employee to terminate her Agreement for good cause. (*See* Burke Agreement § 10.3, Ex. F to Mot. TRO, ECF No. 2-6). The provision explains that an employee must give the employer thirty days written notice that specifies the facts and circumstances providing good cause within thirty days of the event constituting good cause. (*Id.*). After the employee provides notice, the employer may keep the Employee Agreement in effect by either curing the breach or declaring that it disputes good cause exists. (*Id.*). If the employer disputes good cause exists, the dispute goes to binding arbitration. (*See id.* § 12). If an employee successfully achieves a good cause termination, the non-competition provision "no longer applies." (*Id.* § 10.3.4). However, the provision providing for arbitration says that "Nothing herein shall preclude or prohibit . . . Company seeking or obtaining injunctive or other equitable relief." (*Id.* § 12).

Here, Burke alleges that she provided several reasons she should be released from employment under the Good Cause Termination provision to Plaintiff's president, Melanie Johnson. (Employees' Resp. 10:10–20); (*see also* Burke Emails, Ex. 1 to Burke Decl., ECF No. 16-1). Johnson allegedly responded that, "the non-compete will remain as stated below." (*Id.* 10:20). Burke claims that Johnson did not cure the breach, declare a dispute existed, or contest that the reasons provided satisfied the "good cause" requirement under the agreement. (*Id.* 11:1–12). Plaintiff argues that Burke's notice did not comply with the procedure set out in the Employment Agreement, Burke did not give Plaintiff thirty days advance notice of the violation, and the notice was merely an attempt to renegotiate the restrictive covenants rather than invoke the Good Cause Termination provision. (Reply 10:9–19).

The Court finds that Plaintiff has shown a likelihood of success on the merits that Burke violated her non-competition agreement. The emails between Burke and Johnson show that Burke did not attempt to invoke the Good Cause Termination provision; rather, she highlighted her concerns about her new job duties in an attempt to renegotiate her non-compete agreement before concluding her employment term with Plaintiff. (*See* Burke Emails) ("After eighteen years of service for Borgata and working through the pandemic to prepare the business for success, I hope to leave on a high note. . . . I have fulfilled my agreement with Borgata and request to be released from the non-compete period based on the following factors . . . ."). Whether Plaintiff successfully invoked the agreement is an issue of arbitrability to be decided by the Court unless the parties agreed otherwise. *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–70 (2010). Here, there is no indication that the parties agreed to arbitrate issues of arbitrability. Even if the dispute is arbitrable, Burke's right to arbitration does not affect Plaintiff's right to seek injunctive relief per the terms of the Agreement. (Employee Agreement § 12).

Nevertheless, although Plaintiff has demonstrated that Burke is in breach of her non-competition agreement, it has not alleged facts that Plaintiff has disclosed a trade secret or inevitably will disclose trade secrets of Plaintiff during Burke's employment with Ocean. Mere similarity of employment does not establish threatened misappropriation, and "the issuance of an injunction based on a claim of threatened misappropriation *requires a greater showing than mere possession* by a defendant of a trade secret by proper means." *See Power Integrations, Inc. v. De Lara*, No. 20-cv-410-MMA, 2020 U.S. Dist. LEXIS 52724, 2020 WL 1467406, at *19 (S.D. Cal. Mar. 26, 2020) (emphasis original) (quoting *Cent. Valley Gen. Hosp. v. Smith*, 75 Cal. Rptr. 2d 771, 792 (Cal. Ct. App. 2008)). The Court finds Plaintiff's evidence that Burke will inevitably use or disclose Plaintiff's customer database while working for Ocean unconvincing; the claim is based only on conclusory allegations. Likewise, the Court cannot

conclude that Ocean misappropriated Plaintiff's trade secrets vis-a-vi inducing Burke to breach either her confidentiality or non-compete agreement.

      ii. <u>Breach of Contract</u>

Although the Court finds in the immediately preceding discussion that Plaintiff has not demonstrated a likelihood of success on the merits against Burke for trade secret misappropriation, the Court finds that Burke is in breach of its Employment Agreement with Plaintiff by violating the non-competition provision. The Court next considers whether Plaintiff has shown a likelihood of success on the merits against Ocean for tortious interference.

      iii. <u>Tortious Interference</u>

Plaintiff alleges that Ocean tortiously interfered with Callahan and Burke's employment agreements by soliciting them to work for Ocean in contravention of the agreements. (Compl. ¶¶ 93–95). To state a claim for tortious interference under New Jersey law, a plaintiff must prove, "(1) she has some reasonable expectation of economic advantage; (2) the defendants' actions are malicious in the sense that the harm is inflicted intentionally and without justification or excuse; (3) the interference causes the loss of the prospective gain or there is a reasonable probability that the plaintiff would obtain the anticipated economic benefit; and (4) the injury causes the plaintiff damage." *Singer v. Beach Trading Co.*, 876 A.2d 885, 895 (N.J. Ct. App. 2005). Here, Plaintiff has offered no evidence that Ocean acted to intentionally harm Plaintiff without cause or excuse by hiring Callahan and Burke. Nor has Plaintiff alleged its damages. Accordingly, Plaintiff has not shown a likelihood of success on the merits on its tortious interference claim. The Court proceeds by analyzing the remaining factors for whether a TRO should issue.

  **B.** **Likelihood of Irreparable Harm**

To carry its burden, Plaintiff must also establish that it will likely suffer irreparable harm without the issuance of injunctive relief. *Winter*, 555 U.S. at 21. Plaintiff must "demonstrate a

likelihood of irreparable injury—not just a possibility—in order to obtain preliminary relief." *Id.*

Here, Plaintiff has shown that allowing Defendants to continue to use Plaintiff's trade secrets and confidential information would likely result in immediate and irreparable injury to Plaintiff in the form of loss of income, loss of goodwill, damage to its reputation, and damage to its business relationships. (Compl. ¶¶ 106–117); (Turner Decl. ¶¶ 1–16); (Bruno Decl. ¶¶ 1–11); *see Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919 (D. Nev. 2006) (holding that the harm occasioned by disclosure of trade secrets or confidential information is sufficient to meet the irreparable harm requirement); *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 853 (N.D. Cal. 2019); *Planned Parenthood of Great Nw. & Hawaiian Islands, Inc. v. Azar*, 352 F. Supp. 3d 1057, 1065 (W.D. Wash. 2018). The likelihood of irreparable harm element is therefore satisfied.

### C. Balance of Equities

In cases where a plaintiff has shown a defendant is likely misappropriating a trade secret, courts have routinely held that the degree of hardships favors the plaintiff. *See, e.g.*, *WeRide Corp.*, 379 F. Supp. 3d at 854. Regarding only use or disclosure of Plaintiff's trade secrets, if Burke and Callahan are not in positions to use Plaintiff's trade secrets or are not using them, then imposition of a narrowly tailored temporary restraining order will not harm Defendants. Conversely, even if Defendants are using Plaintiff's trade secrets, imposing this temporary restraining order will not harm any of Defendants' legitimate business and will only protect Plaintiff's rights. As such, this factor favors Plaintiff.

Different issues arise when a plaintiff requests the Court to force the termination of an employment agreement. The Defend Trade Secrets Act codifies a policy against enjoining employment even when competitive employment may result in the disclosure of trade secrets. *See* 18 U.S.C. 1836(b)(3)(A)(i)(I) (preventing courts from granting injunctions that "prevent a

person from entering into an employment relationship, and [requiring] that conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows."). Even if an injunction is sought to enforce a non-competition agreement, the agreement may only be enforced if there is a proprietary interest of the employer at stake worthy of judicial protection. *See Ingersoll-Rand Co. v. Viavatta*, 542 A.2d 879, 892 (N.J. 1988). Here, Plaintiff's only alleged proprietary interests in Burke's employment stem from the trade secrets she allegedly possesses. Therefore, pursuant to the DTSA's limitation on injunctive relief enjoining employment, the Court finds that Burke and Callahan must remain in their jobs with Ocean, and the Court can fashion a remedy to protect against threatened misappropriation of trade secrets.[8]

### D. Public Interest

"The public interest analysis for the issuance of [injunctive relief] requires [district courts] to consider whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) (citation omitted). In this case, the Court finds no such public interest that would be injured by the issuance of such injunctive relief.

Moreover, the public interest favors imposing a temporary restraining order. As this District has held, "there is a strong public interest in protecting trade secrets, as evidenced by the existence of the DTSA and [similar state law]." *Protection Techs., Inc. v. Ribler*, No. 3:17-cv-00144-LRH-WGC, 2017 WL 923912, at *3 (D. Nev. Mar. 8, 2017). Accordingly, the Court finds that Plaintiff has satisfied the requirements of imposing a temporary restraining order on Defendants and grants the Motion in part.

---

[8] Although Plaintiff may be able to win enforcement of Burke's non-competition agreement to protect against disclosure of trade secrets under New Jersey state law, the Court finds it inappropriate to do so here because Plaintiff has not demonstrated a likelihood of success that Burke threatens to disclose Plaintiff's trade secrets by virtue of her employment with Ocean. *See Coskey's Television & Radio Sales and Serv., Inc. v. Foti*, 602 A.2d 789, 794 (N.J. Ct. App. 1992). To do otherwise would cause undue hardship to Burke.

### E. Bond

The issuance of a temporary restraining order is conditioned on the movant posting security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "The district court is afforded wide discretion in setting the amount of the bond, and the bond amount may be zero if there is no evidence the party will suffer damages from the injunction." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003). Further, a strong likelihood of success on the merits may favor "a minimal bond or no bond at all." *California v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985).

Given the likelihood that Plaintiff will succeed on the merits on some of its claims, the limited hardship that a narrow temporary restraining order will impose, and the absence of Defendants' briefing about whether Plaintiff need post bond, there is a low probability that Defendant will suffer damages caused by an improperly granted temporary restraining order. The Court therefore declines to order a bond in this case.

## IV. CONCLUSION

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Temporary Restraining Order is **GRANTED** with respect to Callahan and Burke. Plaintiff's Motion is **DENIED** as against Ocean.

**IT IS FURTHER ORDERED** that Callahan and Burke are **TEMPORARILY RESTRAINED** from contacting, soliciting, diverting, or otherwise interfering with any past, prospective, or current patrons or clients of Plaintiff;

**IT IS FURTHER ORDERED** that Callahan and Burke are **TEMPORARILY RESTRAINED** from retaining, using, or disclosing to Ocean, or any other competitor of Plaintiff, any confidential, non-public information or trade secrets of Plaintiff;

**IT IS FURTHER ORDERED** that Callahan and Burke shall immediately return all of Plaintiff's property or any copies made of such property that contain trade secrets of Plaintiff, whether possessed by Callahan, Burke, their agents, or third-parties including, but not limited to Callahan's Plaintiff-issued smartphone;

**IT IS FURTHER ORDERED** that Plaintiff's request for expedited discovery is **GRANTED**, and Callahan and Burke shall appear and be deposed by Plaintiff's counsel within ten (10) days of issuance of this Order;

**IT IS FURTHER ORDERED** that Plaintiff shall serve Defendants with a copy of this Order by Friday, September 11, 2020;

**IT IS FURTHER ORDERED** that Defendants shall file a Response to Plaintiff's Motion for Preliminary Injunction, (ECF No. 9), by Tuesday, September 15, 2020. Thereafter, Plaintiff shall have until Friday, September 18, 2020 to file its Reply.

**IT IS FURTHER ORDERED** that this matter is set for hearing on Plaintiff's Motion for Preliminary Injunction on Wednesday, September 23, 2020, at 1:00 p.m. in Las Vegas Courtroom 7D.

Dated this 10 day of September, 2020.

_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT